## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

KENYETTA RICHARD, as natural tutrix to Z.C.,     CIVIL ACTION
minor child of KADDARRIUS CAGE

VERSUS                               24-419-SDD-EWD

SHERIFF SID GAUTREAUX, ET AL.

## **RULING**

Before the Court is defendant's, the City of Baton Rouge/Parish of East Baton Rouge's ("City/Parish" or "Defendant"), Motion to Dismiss.[1] Plaintiff Kenyetta Richard, as natural tutrix to Z.C., minor child of Kaddarrius Cage ("Plaintiff") opposes the motion.[2] Defendant has not filed a reply. The Court has reviewed the allegations, the arguments of the parties, and the law, and is prepared to rule. For the following reasons, the City/Parish's motion is denied.

I.    **BACKGROUND**

    **A. Factual Allegations**

This case concerns the tragic death-by-suicide of Kaddarrius Cage ("Cage"), a pretrial detainee at East Baton Rouge Parish Prison ("EBRPP") from May 19, 2023, to May 31, 2023. As detailed below, Cage suffered from various mental illnesses. He hung himself from the bars of his cell while in solitary confinement. During his time at EBRPP, Cage did not receive any mental health treatment nor have access to his five antipsychotic prescription medications. Likewise, Cage was subject to various "inhumane" living

---

[1] Rec. Doc. 19.
[2] Rec. Doc. 29.

conditions at a prison long recognized as ill-equipped to meet the needs of mentally ill inmates.

### 1. Allegations of Cage's Arrest and Detention at EBRPP

Cage was diagnosed with schizophrenia, bipolar disorder, and post-traumatic stress disorder around the age of 18.[3] His schizophrenia caused him to suffer from hallucinations that made him see people and hear voices or noises that others could not.[4] On May 19, 2023, Cage had a schizophrenic and/or manic episode in which he hallucinated that his stepfather was attempting to molest him.[5] As a result of this episode, Cage stabbed his stepfather,[6] who was later hospitalized for a head wound.[7] Sheriff's deputies responded to the scene and arrested Cage for attempted second degree murder.[8]

Following his arrest, deputies took Cage to EBRPP, despite normally taking him to inpatient mental health facilities after other schizophrenic and/or manic episodes.[9] These deputies knew Cage "had schizophrenia and bipolar disorder, had previous Orders of Protective Custody after being considered a danger to himself or others, had previously been in mental health wards[,] and . . . was currently suffering from hallucinations."[10] Moreover, Cage's mother told Detective Will Bankston ("Detective Bankston") and sheriff's deputies that Cage needed to be under a permanent physician emergency

---

[3] Rec. Doc. 4, ¶ 7.
[4] *Id.* at ¶ 8.
[5] *Id.* at ¶ 11.
[6] *Id.* at ¶ 15.
[7] *Id.* at ¶ 11.
[8] *Id.* at ¶ 13.
[9] *Id.*
[10] *Id.*

certificate ("PEC") and that the family would hide weapons from Cage to prevent him from harming himself or others.[11]

At the time of his arrest, Cage was on five antipsychotic medications to control his schizophrenia and bipolar disorder.[12] He made bizarre statements to the arresting deputies such as "I got heroism."[13] Cage told Detective Bankston in an interview following his arrest that "they've been raping people in the neighborhood" and that his stepfather attacked his little brother and stepmother, who was "hollering and screaming."[14] Detective Bankston and another sheriff's deputy noticed Cage had a visible bruise or knot on his head, which Cage was unsure of the origin.[15] Cage's mother later called Detective Bankston worried that her son would hurt himself while at EBRPP, but Detective Bankston assured her "that nothing would happen to her son" and that Cage "was on suicide watch."[16]

During intake at EBRPP, Cage informed Cepeada Woodson ("Woodson"), an employee of Turn Key Health Clinics, LLC ("Turn Key")— the private entity contracted to provide healthcare to pretrial detainees at EBRPP—that he was hearing noises and/or voices and that he told EBRPP officials he was paranoid schizophrenic.[17] Cage made various  other representations during this screening, including that he received injections for his schizophrenia;[18] was currently taking medications;[19] was in a mental health facility

---

[11] *Id.* at ¶¶ 17–19.
[12] *Id.* at ¶ 9.
[13] *Id.* at ¶ 15.
[14] *Id.* at ¶ 20.
[15] *Id.* at ¶ 21.
[16] *Id.* at ¶ 23.
[17] *Id.* at ¶¶ 5, 25, 126.
[18] *Id.* at ¶ 26.
[19] *Id.* at ¶ 27.

the month prior;[20] was a recent victim of sexual abuse;[21] and had repetitive thoughts, flashbacks, and/or nightmares "related to PTSD or something terrible."[22] Cage's intake notes documented that he was "nervous and anxious" and that he had a large bump or knot on his forehead, which he, again, was unsure of the source.[23] Instead of taking Cage to a doctor, hospital, or registered nurse, Cage was brought to EBRPP's N line, "which houses severely mentally ill and suicidal patients in isolation or solitary confinement."[24]

### 2. Allegations Regarding Cage's Suicide

While on EBRPP's N line, Cage was "on lockdown in a single cell" and received only a suicide blanket, a suicide smock, and a blue shirt.[25] The N line has an "open bar design in the cells," which "make[s] it an easy place to anchor a ligature for suicide . . . ."[26] Cage's "cell was dark, littered with scrawlings from previous detainees on the walls including the words, 'blood,' 'crips[,]' and 'die[,]'" and Cage was to sleep on "a shockingly thin mattress without bed linens . . . ."[27] Under EBRPP's written policies and procedures, Cage had limited telephone privileges and, consequently, was unable to speak to his family for the 12 days he was detained at the prison.[28] Moreover, per these policies and procedures, prison officials were to make rounds on the N line every 15 minutes for suicidal inmates and every 30 minutes for mentally ill inmates.[29]

---

[20] *Id.* at ¶ 26.
[21] *See id.* at ¶ 29. It was also noted during his intake screening that Cage had blood on his shorts. *Id.*
[22] *Id.* at ¶ 28.
[23] *Id.* at ¶¶ 30, 33.
[24] *Id.* at ¶ 31. *See also id.* at ¶ 73 ("The M and N line of the EBR prison, where Kaddarrius Cage was housed, has historically been used to house those pre-trial detainees on suicide watch and those that are acutely mentally ill, according to EBRPP policy and procedure."); *id.* at ¶ 211 ("Indeed, written policy and procedure states that prisoners on suicide watch or mental health observation must be placed on lockdown, in other words, solitary confinement.").
[25] *Id.* at ¶ 58.
[26] *Id.* at ¶ 74. *See also id.* at ¶¶ 81, 83 (images of Cage's cell illustrating the "open bar design").
[27] *Id.* at ¶ 58.
[28] *Id.* at ¶¶ 69–72, 93–94, 296.
[29] *Id.* at ¶ 88.

Yet, such procedures were not followed in this case.[30] On May 31, 2023, at 10:03 a.m.[31] while being escorted to the M and N lines to assess two other inmates, Nurse Pierson Derek ("Nurse Derek") noticed Cage hanging by his neck from his cell's bars with his feet floating in the air.[32] Sometime that morning, Cage used the blue shirt he was issued as a ligature and committed suicide.[33] Cage was pronounced dead at 10:49 a.m.[34] According the Nurse Derek, Cage was "cold to the touch with cyanosis to his fingertips"— a blue discoloration in the fingertips due to a lack of oxygen in the blood.[35] Corporal R. Jackson, the officer who was escorting Nurse Derek, then radioed in that there was a medical emergency.[36] Corporal Hollis Walker ("Corporal Walker") and Nurse Tramecka Hollie ("Nurse Hollie") responded.[37] Corporal Walker noticed that Cage's feet were blue, and Nurse Hollie saw that his nail beds were blue as well.[38] This sort of blue coloring of the extremities is associated with the "process of blood accumulating within the blood vessels in the extremities of the body as a result of gravity," also known as livor mortis.[39]

"According to medical literature[,] liv[o]r mortis begins to be apparent approximately an hour after death . . . [,] is well-formed 3-4 hours after death[,]"[40] and "may not be apparent in dark-skinned individuals."[41] Despite Cage having dark skin, his extremities were clearly blue, suggesting that he had been deceased for quite some time

---

[30] *Id.* at ¶ 112.
[31] The Court notes the Amended Complaint's discrepancies in what time Cage was found. *See, e.g.*, *id.* at ¶ 98 (noting Cage was found at 10:03 a.m.) and *id.* at ¶¶ 114, 118 (noting Cage was found at 10:10 a.m.).
[32] *Id.* at ¶ 98.
[33] *Id.* at ¶¶ 58, 102. The Court notes Plaintiff's allegation that Cage was not wearing a shirt at the time of his death. *Id.* at ¶ 102.
[34] *Id.* at ¶ 118.
[35] *Id.* at ¶ 100.
[36] *Id.* at ¶ 101.
[37] *Id.* at ¶¶ 105–06.
[38] *Id.*
[39] *Id.* at ¶ 108.
[40] *Id.* at ¶ 111.
[41] *Id.* at ¶ 109.

before found.[42] Likewise, Nurse Derek's observation that Cage was "cold to the touch" suggests that he was in stage two of livor mortis, or algor mortis.[43] Thus, "[t]he only conclusion that can be made due to apparent liv[o]r mortis observed by those who found . . . Cage hanging is that the sheriff's prison employees . . . did not timely observe or monitor . . . Cage despite, upon information and belief, h[im] [being] on mental health observation and/or suicide precautions."[44] This conclusion is further supported by EBRPP logbooks, which show that prison staffs' last rounds on the N line were approximately an hour and forty-five minutes before Cage was found, clearly violating EBRPP's policy that rounds were to occur every 15 or 30 minutes.[45]

### 3. Allegations of Lack of Healthcare While at EBRPP

Upon intake at EBRPP, no continuity of care plan was established for Cage nor was he referred to a physician for evaluations of his schizophrenia or the visible knot on his head.[46] Cage also did not received any mental healthcare despite being marked as needing an "Urgent Referral MH" (for mental health).[47] A mental health appointment was scheduled for Cage for May 25, 2023,[48] but Amy Smith ("Smith"), a social worker for Turn Key, deleted this appointment.[49] A rescheduled appointment was set for June 1, 2023, but Cage committed suicide the day before.[50] Cage did, however, see Paris Moore, RN

---

[42] *Id.*
[43] *Id.* at ¶ 110.
[44] *Id.* at ¶ 112. *See also id.* at ¶ 113 ("Clearly, Kaddarrius Cage had not been monitored in either 15 minute or 30 minute intervals, given that his extremities had already turned blue when he was found and was cold to the touch.").
[45] *Id.* at ¶ 114.
[46] *Id.* at ¶ 34 ("[T]here was no continuity of care plan needed according to employees working[,] and it was noted, 'no referral needed at this time.'"). *See also id.* at ¶ 169 ("Additionally, upon information and belief Turn Key does not offer an on-site physician, psychiatrist or psychologist at EBRPP.").
[47] *Id.* at ¶ 36.
[48] May 25, 2023, was six days after Cage's detention.
[49] *Id.* at ¶ 45.
[50] *Id.*

("Moore" or "Nurse Moore"), a few hours before his death, and Moore marked Cage as being on "Mental Health Observation(N02)."[51]

Cage made various representations to his social worker Smith during his time at EBRPP, including that it was his first time at the prison,[52] he could hear voices and "see[] black figures/people and other objects[,]"[53] he had been inpatient at several psychiatric facilities prior to his incarceration,[54] he had only received "'a few hours' of sleep" within the past 72 hours,[55] and that he had received injections to treat his schizophrenia prior to arriving at EBRPP.[56] In light of these representations, Smith marked Cage as being "cleared from MHO and placed on MH SPNH."[57]

In addition to never seeing a doctor or mental health professional,[58] Cage never received any of his medications.[59] Cage's mother repeatedly called EBRPP and expressed that Cage needed his daily medications or he would harm himself.[60] In response to one of these phone calls, Detective Bankston told Cage's mother that her son was on suicide watch and assured her that being on suicide watch would prevent Cage from hurting himself.[61] Per the Rules and Regulations of Inmates at EBRPP, Cage's mother was allowed to bring her son his medications so that he could take them while waiting for a prison physician's authorization and approval.[62] The only caveat was that

---

[51] *Id.* at ¶¶ 50–51.
[52] *Id.* at ¶ 39.
[53] *Id.* at ¶ 40.
[54] *Id.* at ¶¶ 42, 44.
[55] *Id.* at ¶ 43.
[56] *Id.* at ¶ 44.
[57] *Id.* at ¶ 39. The Court notes that Plaintiff's allegations do not define these acronyms, and it assumes that "MH" stands for "Mental Health."
[58] *Id.* at ¶¶ 95, 97.
[59] *Id.* at ¶ 46.
[60] *Id.* at ¶ 47. *See also id.* at ¶¶ 59–66.
[61] *Id.* at ¶ 48.
[62] *Id.* at ¶ 89.

EBRPP had to first verify Cage's medication with his prescribing physician and/or pharmacy.[63] Woodson noted during intake that Cage was "on meds" and marked him as highest priority (priority 1).[64] However, no medication verification was ever initiated in the 12 days Cage was at EBRPP, so Cage never received any of his five antipsychotic medications prior to his suicide.[65] It was not until approximately three hours after Cage's death that Nurse Moore attempted to verify Cage's medications with his pharmacy.[66]

### 4. Allegations Regarding Prison Conditions at EBRPP

The City/Parish, through the EBR Metropolitan Council, is responsible for physically maintaining and financing EBRPP.[67] On January 1, 2016, the City Parish contracted Health Management Associates ("HMA") to assess the medical services and clinical operations of EBRPP.[68] HMA conducted onsite visits from February 23–26, 2016, which included interviewing EBRPP staff and examining prison medical service records.[69] In its report, HMA found that EBRPP was "insufficient to meet the needs of the EBR prison population[,]" that the "physical plant is notably deficient[,]" that the prison "need[ed] sufficient ADA complaint space for population[,]" and that "medical provider staffing [was] insufficient."[70] HMA also found that "[t]he barred cells that house mentally [ill] males and

---

[63] *Id.*

[64] *Id.* at ¶ 35. *See also id.* at ¶ 37 (noting that Cage was also flagged as "highest priority" on May 19, 2023; May 20, 2023; May 21, 2023; May 22, 2023; and May 25, 2023).

[65] *Id.* at ¶¶ 35, 41, 46, 90, 95. *See also id.* at ¶¶ 67–68 ("Turn Key Health Clinics, LLC repeatedly denied that Ms. Cage could bring Kaddarrius's at home medications to the EBRPP, even though according to the contract an inmate's home medications were allowed, if Turn Key staff just verified it.").

[66] *Id.* at ¶ 119.

[67] *Id.* at ¶ 131.

[68] *Id.* at ¶ 76.

[69] *Id.* at ¶ 134.

[70] *Id.* at ¶¶ 136–37. *See also id.* at ¶ 139 ("The HMA report also found that EBRPP housed the most unstable mentally ill in woefully inadequate physical environments, and those places as 'other lockdown areas are frequently loud with inmates who are shaking bars, throwing feces, etc.'"); *id.* at ¶ 142 ("Moreover, according to HMA, 'The structure of the facility limits the ability to provide MH [Mental Health] programing, limits direct observation of mentally ill, at-risk patients, and limits the ability to house MH in dorms.'").

females create a suicide risk for this high-risk population"[71] and that the prison's "episodic and inconsistent" healthcare would not pass national standards for healthcare in a correctional facility.[72] Moreover,

> [n]otes from HMA created pursuant to their tour of the jail, interviews, and data review observed that, "There is not a mental housing unit at EBR prison." M-1 and the N line "serves as a de facto male inpatient mental health unit—single bed cells, open barred doors, loud (other patient-yelling during tour), no group rooms, no dayroom, no private interview area. . . . Correctional officers do a 15-minute suicide watch by walking through the linear design unit."[73]

Following its 2016 assessment, "HMA recommended doubling the parish's annual corrections healthcare budget from about $5 million to about $10 million."[74] Despite HMA's recommendation, the City/Parish only raised its corrections healthcare budget 12% through contracting with CorrectHealth to privatize medical services at EBRPP.[75] Plaintiff alleges that in the three years CorrectHealth provided medical services, there were twenty deaths at the prison.[76] In December 2021, EBRPP then contracted with Turn Key for $5,589,975 to provide healthcare at EBRPP.[77] Under this contract, Turn Key implemented its "widespread practice and *de facto* policy" of utilizing cost-saving measures to put profits over the well-being of prisoners.[78] While Turn Key provided

---

[71] *Id*. at ¶¶ 77, 198(kk).
[72] *Id*. at ¶ 138.
[73] *Id*. at ¶ 141.
[74] *Id*. at ¶ 140.
[75] *Id*. at ¶ 143.
[76] *Id*. at ¶ 145. *See also id.* at ¶ 144 ("Due to an inordinate number of deaths, CorrectHealth declined or could not answer many questions posed to it by the Metro Council regarding the deaths at EBRPP.").
[77] *Id*. at ¶ 146.
[78] *See, e.g.*, *id.* at ¶¶ 160–61, 165, 170–72, 184, 188. *See also id*. at ¶ 187 (outlining Turn Key's cost-saving measures in other states as examples of the company prioritizing profits over prisoners).

medical services, nine pretrial detainees died.[79] The City/Parish never hired an independent healthcare monitor to oversee Turn Key's operations.[80]

Inmate deaths at EBRPP was not an issue exclusive to the tenures of CorrectHealth and Turn Key:

> As far back as Jan. 14, 2015, the City of Baton Rouge-Parish of East Baton Rouge Metropolitan Council ("Metro Council") held a public meeting, where William Daniel, the Chief Financial Officer of the City/Parish, stated, "We've had mental health patients die in the prison[]" and characterized this as "a serious, serious situation." He further told the Metro Council as to the whether it is an emergency, he said that an "emergency" is when "people are in a position where they can be harmed or lose their life, to me, that is an emergency." He called the situation "dire" and characterized the question of more funding thusly: "This is life or death" for the mentally ill in the jail. Daniel concluded by saying, "Multiple studies have shown that almost half of the inmates who commit suicide in prison are mentally ill....Most of the correctional officers don't understand how to deal with the mentally ill."[81]

Warden Dennis Grimes ("Warden Grimes") has made various comments about prison conditions at EBRPP. He previously "told the Metro Council that the jail is 'deplorable' and 'is very deplorable as far as mental health is concerned'" and that the impacts of mentally ill inmates have "overrun" the prison.[82] Warden Grimes also testified in 2019 that

- "he knew . . . bars could be used as anchors for ligatures and suicides, and it was a 'concern'";[83]

- "the M and N units or lines would have been shut down if Federal officials had come in and inspected the facility";[84]

---

[79] *Id.* at ¶¶ 121, 149. *See also id.* at ¶ 185 ("Upon information and belief, Turn Key had a policy of utilizing non-medical personnel, under qualified personnel, improperly licensed medical personnel and being woefully understaffed was the cause of nine (9) deaths at the EBRPP in a relatively short amount of time.").
[80] *Id.* at ¶ 150.
[81] *Id.* at ¶ 151. *See also id.* at ¶ 198 (detailing the tragic deaths and experiences of numerous mentally ill pretrial detainees who committed suicide while at EBRPP); *id.* at ¶¶ 200–16 (describing the high death rate at EBRPP compared to other local jails and the inordinate number of suicides at EBRPP).
[82] *Id.* at ¶ 152.
[83] *Id.* at ¶ 79.
[84] *Id.* at ¶ 80.

- "there is hardly any surveillance of the N units or lines due to the old design of the EBR prison";[85] and

- EBRPP is not designed or equipped to handle inmates with mental health needs.[86]

Other prison and city officials have made similar comments,[87] and there has been years of extensive news coverage of the "inhumane" prison conditions at EBRPP.[88] Notably, news outlets have reported that "there are [so] many rats" pretrial detainees must "sleep with . . . commissary items in bed so the rats don't eat them";[89] there is "mold everywhere";[90] the "walls [are] sometimes smeared with feces";[91] and pretrial detainees "have spoken of bedbugs, spider bites, and rats in the stew."[92] From 2016 to 2024, there have been at least 14 Louisiana Department of Health violations at EBRPP, most notably a scabies infestation.[93] Records dating back to October 2015 show that Sheriff Sid Gautreaux "requested a new jail 'for years' and that officials 'long ago identified the problem: a dilapidated facility that is ill-equipped to hold . . . [the] mentally ill who are booked.'"[94] Likewise, Metro Councilman Darryl Hurst is on record stating "I don't think [EBRPP] is suitable for my dog" and that the current conditions of EBRPP "literally created

---

[85] *Id.* at ¶ 84.
[86] *Id.* at ¶ 85.
[87] *See, e.g., id.* at ¶¶ 153–55, 198 (detailing other prison and city officials' general comments on prison conditions at EBRPP).
[88] *See, e.g., id.* at ¶¶ 198 (detailing this media coverage and providing images of mold and rats at the prison).
[89] *Id.* at ¶ 198(c).
[90] *Id.* at ¶ 198(e).
[91] *Id.* at ¶ 198(pp).
[92] *Id.* at ¶ 198(d).
[93] *See, e.g., id.* at ¶¶ 199–200.
[94] *Id.* at ¶ 198(n).

trauma in my head."[95] Councilman Dwight Hudson has recently opined that "[i]t's going to take additional money. It's badly needed. The facility has really got some issues, and that's widely acknowledged through the city-parish."[96]

### B. Procedural Background

On May 29, 2024, Plaintiff brought suit against multiple defendants asserting violations of Cage's civil rights under 42 U.S.C. § 1983, a survival action, and a claim for his wrongful death.[97] Plaintiff amended her Complaint on May 31, 2024, to assert the factual allegations outlined above and name the following as defendants: (1) the City/Parish; (2) Sid Gautreaux, in his official and individual capacity as Sheriff of East Baton Rouge Parish; (3) Dennis Grimes, in his official and individual capacity as Warden of the East Baton Rouge Parish Prison; (4) Rashie McDowell, individually; (5) Ryan Jackson, individually; (6) Christian Morris, individually; (7) Deputy Jenkins, individually; (8) Hollis Walker, individually; (9) Will Bankston, individually; (10) Leonard Harris, individually; (11) American Alternative Insurance Corporation; (12) Turn Key Health Clinics, LLC; (13) Cepeada Woodson; (14) Paris Moore; (15) Amy Smith; and (16) Alysius Allen.[98]

Against the City/Parish in particular, Plaintiff brings two claims: (1) a 42 U.S.C. § 1983 claim alleging that the pervasive, extended deficiencies and misconduct with respect to EBRPP's conditions of confinement constitute a *de facto* policy that amounted to punishment before adjudication in violation of the Fourteenth Amendment's Due

---

[95] *Id.* at ¶ 198(ee). *See also id.* at ¶ 198(jj) ("In February of 2020, Councilwoman Donna Collins-Lewis of the East Baton Rouge Metro Council discussing deaths at EBRPP said, 'I wouldn't want my worst enemy going to parish prison.' She went on to describe the EBRPP as a 'hellhole.'").
[96] *Id.* at ¶ 198(gg).
[97] Rec. Doc. 1, ¶ 1.
[98] Rec. Doc. 4.

Process Clause;[99] and (2) a *Monell*[100] claim to hold the City/Parish liable for same.[101]  On July 24, 2024, the City/Parish filed the present Motion to Dismiss these claims,[102] which Plaintiff opposes.[103]

## II.    LAW AND ANALYSIS

### A.  Rule 12(b)(6) Standard

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[104] The Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[105] "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[106]

In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court set forth the basic criteria necessary for a complaint to survive a Rule 12(b)(6) motion to dismiss: "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."[107] A complaint is also insufficient if it merely "tenders 'naked

---

[99] *Id.* at ¶¶ 218–58.
[100] *See infra* Part II.C.
[101] *Id.* at ¶¶ 259–65.
[102] Rec. Doc. 19.
[103] Rec. Doc. 29.
[104] *In re Katrina Canal Breaches Litig.*, 495 F. 3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F. 3d 464, 467 (5th Cir. 2004)).
[105] *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F. 3d 757, 763 (5th Cir. 2011) (internal citations omitted).
[106] *In re Katrina Canal Breaches Litig.*, 495 F. 3d at 205 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).
[107] *Twombly*, 550 U.S. at 545 (internal citations and brackets omitted).

assertion[s]' devoid of 'further factual enhancement.'"[108] However, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[109] In order to satisfy the plausibility standard, the plaintiff must show "more than a sheer possibility that the defendant has acted unlawfully."[110] "Furthermore, while the court must accept well-pleaded facts as true, it will not 'strain to find inferences favorable to the plaintiff.'"[111] "On a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[112]

### B.  Conditions of Confinement Claim

"Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'"[113] In order to state a claim under 42 U.S.C. § 1983, the plaintiff must establish two elements: "(1) that the conduct in question deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States; and (2) that the conduct complained of was committed by a person acting under color of state law."[114] As for the first element, 42 U.S.C. § 1983 only imposes liability for violations of rights protected by the United States Constitution—not for violations of duties of care arising out of tort law.[115] As to the second element, a "plaintiff must identify defendants who were either personally

---

[108] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).
[109] *Id*.
[110] *Id*.
[111] *Taha v. William Marsh Rice Univ.*, No. 11-2060, 2012 WL 1576099, at *2 (S.D. Tex. May 3, 2012) (quoting *Southland Sec. Corp. v. Inspire Ins. Sols., Inc.*, 365 F. 3d 353, 361 (5th Cir. 2004)).
[112] *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).
[113] *Blessing v. Freestone*, 520 U.S. 329, 340 (1997).
[114] *Jones v. St. Tammany Par. Jail*, 4 F. Supp. 2d 606, 610 (E.D. La. 1998). *See also Elphage v. Gautreaux*, 969 F. Supp. 2d 493, 500 (M.D. La. 2013).
[115] *Griffith v. Johnston*, 899 F.2d 1427, 1436 (5th Cir. 1990).

involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged."[116]

In evaluating constitutional claims by pretrial detainees, courts in the Fifth Circuit distinguish between challenges to general conditions, practices, rules, or restrictions of confinement and challenges to episodic acts or omissions by jail officials.[117] Plaintiffs may plead both theories in the alternative.[118] Here, Plaintiff indicates that she seeks recovery against the City/Parish for EBRPP's conditions of confinement.[119] Specifically, she claims that the pervasive, extended deficiencies and misconduct with respect to EBRPP's conditions of confinement constituted a *de facto* policy that amounted to punishment before adjudication in violation of the Fourteenth Amendment's Due Process Clause.[120]

A conditions of confinement claim "is a '[c]onstitutional attack[] on general conditions, practices, rules, or restrictions of pretrial confinement.'"[121] In such cases, the harm is caused by the condition itself.[122] "A condition of confinement is 'usually the manifestation of an explicit policy or restriction,' although a condition may also reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [officials], to prove an intended condition or practice.'"[123] In asserting a conditions of confinement claim, the "reasonable relationship test of *Bell v. Wolfish* is apposite."[124]

---

[116] *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995).
[117] *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 643 (5th Cir. 1996).
[118] *Shepherd v. Dall. Cnty.*, 591 F.3d 445, 452 n.1 (5th Cir. 2009).
[119] Rec. Doc. 4, ¶¶ 218–58.
[120] *Id.*
[121] *Scott v. Moore,* 114 F.3d 51, 53 (5th Cir. 1997) (alternations in original) (quoting *Hare*, 74 F.3d at 644).
[122] *Watts v. Pourciau*, No. 20-196, 2020 WL 7344613, at *2 (M.D. La. Nov. 16, 2020).
[123] *Zavala v. City of Baton Rouge/Par. of E. Baton Rouge*, No. 17-656, 2018 WL 4517461, at *9 (M.D. La. Sept. 20, 2018) (citing *Shepherd*, 591 F.3d at 452).
[124] *Scott*, 114 F.3d at 53 (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)).

According to that test, "a constitutional violation exists only if we [ ] find that the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective."[125]

The Court notes that the City/Parish's motion focuses heavily on the argument that it did not act with "deliberate indifference." However, a pretrial detainee does not need to show deliberate indifference in order to state a claim for unlawful conditions of confinement under the Fourteenth Amendment.[126] Again, all Plaintiff needs to show under *Bell v. Wolfish* is that "the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective."[127] Under the Due Process Clause, "a pretrial detainee may not be punished prior to an adjudication of guilt."[128] "When a pretrial detainee complains of conditions or restrictions of detention, 'the proper inquiry rather is whether those conditions amount to punishment of the detainee.'"[129] "A showing of express intent to punish is not required. Instead, such intent may be presumed where a policy is otherwise senseless."[130] As the Fifth Circuit has framed this notion in another case:

> A State's imposition of a rule or restriction during pretrial confinement manifests an avowed intent to subject a pretrial detainee to that rule or restriction. Likewise, even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices.[131]

---

[125] *Id.* (citing *Bell*, 441 U.S. at 539).
[126] *See Shepherd,* 591 F.3d at 454–55 (quoting *Hare*, 74 F.3d at 644–45).
[127] *Scott*, 114 F.3d at 53 (citing *Bell*, 441 U.S. at 539).
[128] *Jones v. Dall. Cnty.*, No. 21-10617, 2022 WL 3334493, at *2 (5th Cir. Aug. 12, 2022) (citing *Bell*, 441 U.S. at 535).
[129] *Id.* (citing *Bell*, 441 U.S. at 535).
[130] *Shepherd*, 591 F.3d at 454 (citing *Bell*, 441 U.S. at 539).
[131] *Hare*, 74 F.3d at 644.

Taken as true, Plaintiff's allegations state a plausible claim for relief under the Fourteenth Amendment for unlawful conditions of confinement of a pretrial detainee. In her Amended Complaint, Plaintiff alleges that the following constitutes a pattern and/or practice on part of the City/Parish resulting in a violation of Cage's constitutional rights: (1) "[c]ontinuing to utilize Turn Key Health Services when there have already been 9 deaths"; (2) "[f]ailing to hire a contract monitor for Turn Key Health"; (3) "[f]ailing to remove bars that serve as an anchor for ligatures in the N wing which house the severely mentally ill and suicidal prisoners"; (4) "[f]ailing to fund a prison to fit modern standards of decency and humane confinement"; (5) "[f]ailing to adequately fund and adequately contract for medical healthcare and prescription management"; and (6) "[f]ailing to shut down the EBRPP despite knowing of its deplorable and inhumane conditions which are unconstitutional."[132]

Another section of this Court in *Jordan v. Gautreaux* analyzed similar allegations against the City/Parish regarding EBRPP's conditions of confinement:

> Here, Plaintiffs have sufficiently alleged a viable conditions-of-confinement claim against the Parish. Plaintiffs sue the Parish as the "entity responsible for funding operations of the [EBRPP]" and as the party that "negotiates, approves, funds, and enters into contracts with other entities to provide medical and mental health services at the jail[.]" Plaintiffs also make the following allegations related to the Parish:
>
>> Defendant Parish failed to provide sufficient funding and oversight to all defendants, resulting in unconstitutional conditions of confinement at the EBRPP. The Parish's policy of not sufficiently funding and overseeing the EBRPP caused defects in physical design and manner of operation, including inadequate staffing, inadequate medical and mental health care, inadequate supervision techniques, and/or poor

---

[132] Rec. Doc. 4, ¶ 261.

sightlines at the EBRPP, resulting in a continuous pattern of constitutional deprivations for all prisoners in EBRPP, including Mr. Claiborne. Despite overwhelming, publicly documented testimony by countless staff members and consultants, Parish continues to ignore the dangerous conditions of EBRPP, which directly resulted in the death of Mr. Claiborne.

Thus, contrary to the Parish's position, Plaintiffs provide highly specific allegations about the Parish's practices with respect to EBRPP and how they are defective.[133]

In *Zavala v. City of Baton Rouge/ Parish of East Baton Rouge*, that same section of this Court analyzed similar allegations specifically in the context of an EBRPP death-by-suicide on the N line.[134]  In determining that the plaintiff alleged an adequate conditions of confinement claim, the Court explained:

While the City/Parish argues that Zavala has failed to identify any specific custom or policy that caused a constitutional deprivation, this assertion mischaracterizes the allegations in the amended complaint. As the Court has already discussed, Zavala specifically alleged that the City/Parish had an "explicit policy of not sufficiently funding and overseeing EBRPP [which] caused defects in physical design and manner of operation, including inadequate staffing, inadequate supervision techniques, and/or poor sightlines at EBRPP." (Doc. 23 at 24). She also alleged de facto policies at EBRPP as a result of "inadequate staffing, inadequate supervision techniques, and poor sightlines," that enabled certain inmates to "prey on" others, resulting in a "continuous pattern of constitutional deprivations." (*Id.* at 21). And she asserts that the individual Defendants knew the insufficient funding "would result in the deprivation" of healthcare services for "prisoners with serious medical conditions, including serious mental health conditions." (Doc. 23 at 26); *see also* [*O'Quinn v. Manuel*, 773 F.2d 605, 609 (5th Cir. 1985)] ("Where a municipal body is vested with this sort of fiscal obligation to a jail, its liability for insufficient funding or maintenance will depend on its knowledge of conditions at the jail."). Indeed, Zavala alleges in the amended complaint that the City/Parish was notified by its own consultant of serious inadequacies in the medical care provided to

---

[133] *Jordan v. Gautreaux*, 593 F. Supp. 3d 330, 370–71 (M.D. La. 2022) (internal citations omitted).
[134] *Zavala*, 2018 WL 4517461, at *17–18.

detainees and yet deliberately failed to follow the recommendations of that consultant. [135]

The Court finds no significant distinction between allegations in these two cases and those in the present case. The Court finds that Plaintiff adequately pled a conditions of confinement claim against the City/Parish. Like in *Zavala* and *Jordan*, Plaintiff clearly alleges that the City/Parish, through the Metropolitan Council, is responsible for physically maintaining and financing EBRPP and that the City/Parish's lack of funding contributed to the deprivation of Cage's constitutional rights.[136] As summarized above, Plaintiff provides detailed allegations of EBRPP's "inhumane" living conditions and the prison's long-time practice of not providing or properly funding healthcare for mentally ill inmates.[137] Plaintiff also alleges that prison and City/Parish officials have known about these issues for years; have made public comments such as EBRPP not being suitable for animals, let alone inmates with mental illness;[138] and have continuously ignored the advice of the City/Parish's own consultant that EBRPP's healthcare budget should be at least $10,000,000.[139] There are no facts presented which support the contention that EBRPP's conditions of confinement are reasonably related to a legitimate, non-punitive governmental objective. Defendant's Motion to Dismiss as to this issue is denied.

### C. *Monell* Claim

"Although municipalities cannot be held liable under section 1983 by virtue of the doctrine of respondeat superior, they are subject to such liability where official custom or

---

[135] *Id.*
[136] Rec. Doc. 4, ¶¶ 131, 261.
[137] *See supra* Part I.A.4.
[138] *See, e.g.*, Rec. Doc. 4, ¶¶ 80, 84, 85, 138, 152–55, 198.
[139] *Id.* at ¶ 140.

policy is involved in the injury."[140] This principle was first recognized in *Monell v. Department of Social Services*.[141] "Proof of municipal liability sufficient to satisfy *Monell* requires: (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)."[142]

"[T]he standards for a *Monell* claim and for a conditions of confinement claim are similar and frequently overlap."[143] An "official policy or custom" giving rise to liability may be "a persistent, widespread practice which, although not officially promulgated, is so common and well settled as to constitute a custom that fairly represents municipal policy."[144] However, "[a] plaintiff may not infer a policy merely because harm resulted from some interaction with a governmental entity."[145] To plausibly plead "a practice 'so persistent and widespread as to practically have the force of law,' . . . a plaintiff must do more than describe the incident that gave rise to his injury."[146] Further, to show "moving force" causation, a plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[147] "That is, 'the plaintiff must demonstrate

---

[140] *O'Quinn v. Manuel*, 773 F.2d 605, 608 (5th Cir. 1985) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808 (1985)).
[141] 436 U.S. 658 (1978).
[142] *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)).
[143] *Jordan*, 593 F. Supp. 3d at 357. *See also Duvall v. Dall. Cnty.*, 631 F.3d 203, 208 (5th Cir. 2011) ("The jury found that Duvall's injury was caused by a policy or custom of the County. Although the jury found this fact in response to the court's instruction on municipal liability under the *Monell* test, the jury's finding satisfies the need for such a showing in connection with the underlying [conditions-of-confinement] constitutional violation as well.... We see no meaningful difference between these showings.... [W]e are convinced that the jury's finding of a custom or policy under the municipal-liability jury instruction satisfies the custom-or-policy element for purposes of the underlying constitutional violation.").
[144] *Esteves v. Brock*, 106 F.3d 674, 677 (5th Cir. 1997) (internal quotations omitted).
[145] *Colle v. Brazos Cnty., Tex.*, 981 F.2d 237, 245 (5th Cir. 1993).
[146] *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).
[147] *Valle v. City of Hous.*, 613 F.3d 536, 542 (5th Cir. 2010) (quoting *Bd. of Cnty. Comm'r v. Brown*, 520 U.S. 397, 404 (1997)).

that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.'"[148]

Moreover, the Fifth Circuit "has repeatedly held that municipalities or supervisors may face liability under section 1983 where they breach duties imposed by state or local law."[149] Under Louisiana law, "the general statutory scheme is that the parish is responsible for the expenses of establishing, maintaining and operating a jail and for all expenses of feeding, clothing, and providing medical treatment to prisoners."[150] "Where a municipal body is vested with this sort of fiscal obligation to a jail, its liability for insufficient funding or maintenance will depend on its knowledge of conditions at the jail."[151] "The critical point for this case is that such liability may result if municipal officials have actual or constructive knowledge of constitutional violations and fail to carry out their duty to correct them."[152] ⌐

In Count Two, Plaintiff alleges that the City/Parish is liable for the pattern and/or practice, described in the context of Plaintiff's conditions of confinement claim,[153] that resulted in a violation of Cage's constitutional rights. In alleging so, Plaintiff does more than merely describe the incident that gave rise to Cage's injury; she points to the

---

[148] *Id.* (quoting *Brown*, 520 U.S. at 411).

[149] *Jordan*, 593 F. Supp. 3d at 370 (citing *O'Quinn*, 773 F.2d at 608–09).

[150] *Id.* (citing *Boudreaux v. St. Mary Par. Council*, No. 07-614, 2009 WL 1787678, at *4 (W.D. La. June 18, 2009)).

[151] *Id.* (citing *O'Quinn*, 773 F.2d 609).

[152] *Id.* (citing *O'Quinn*, 773 F.2d 608–09).

[153] *See* Rec. Doc. 4, ¶ 261 ((1) "[c]ontinuing to utilize Turn Key Health Services when there have already been 9 deaths"; (2) "[f]ailing to hire a contract monitor for Turn Key Health"; (3) "[f]ailing to remove bars that serve as an anchor for ligatures in the N wing which house the severely mentally ill and suicidal prisoners"; (4) "[f]ailing to fund a prison to fit modern standards of decency and humane confinement"; (5) "[f]ailing to adequately fund and adequately contract for medical healthcare and prescription management"; and (6) "[f]ailing to shut down the EBRPP despite knowing of its deplorable and inhumane conditions which are unconstitutional."). *See also Duvall*, 631 F.3d at 208 (discussing policy and custom in the context of conditions of confinement and *Monell* and concluding: "[W]e are convinced that the jury's finding of a custom or policy under the municipal-liability jury instruction satisfies the custom-or-policy element for purposes of the underlying constitutional violation.").

City/Parish's persistent practice of underfunding mental healthcare and evidence of several years of "inhumane" conditions at the jail.[154] Plaintiff also alleges that the City/Parish had actual knowledge of EBRPP's conditions and policies and practices and provides specific examples of the City/Parish's knowledge that EBRPP is ill-equipped to meet the needs of mentally ill inmates.[155] Plaintiff references numerous deaths-by-suicide of mentally ill inmates during and before Turn Key's tenure at EBRPP.[156] Considering these allegations, Plaintiff has alleged a sufficient causal connection to link the City/Parish's policies as the moving force behind Cage's constitutional violations.

The Court again acknowledges the City/Parish's argument that Plaintiff "has not pled facts that support deliberate indifference to Cage's medical and/or mental health needs."[157] However, Defendant's deliberate indifference argument is in reference to Plaintiff's conditions of confinement claim, not an attempt to refute moving force causation under *Monell*. Even if Defendant's deliberate indifference argument was in the context of Plaintiff's *Monell* claim, this argument would still fail. "Deliberate indifference is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[158] Plaintiff's allegations more than satisfy this standard, as she alleges the City/Parish (1) had actual knowledge of EBRPP's unconstitutional conditions of confinement and the effects of same on mentally ill inmates;[159] and (2) failed to address these issues for years and instead continuously underfunded inmate

---

[154] *See supra* Part I.A.4.
[155] *See* Rec. Doc. 4, ¶¶ 80, 84, 85, 138, 151–55, 198.
[156] *See id.* at ¶¶ 123, 145, 149, 151, 198. *See also id.* at ¶¶ 200–16 (describing the high death rate at EBRPP compared to other local jails and the inordinate number of suicides at EBRPP).
[157] Rec. Doc. 19-2, p. 4.
[158] *Valle*, 613 F.3d at 547 (quoting *Brown v. Bryan Cnty., OK*, 219 F.3d 450, 457 (5th Cir. 2000)).
[159] Rec. Doc. 4, ¶¶ 77, 80, 84–85 136–39, 141–42, 151–55, 198.

healthcare by around 50% of the recommended budget.[160] Accordingly, the Court finds that Plaintiff has plausibly alleged a *Monell* claim.[161] The Defendant's Motion to Dismiss the *Monell* claim is denied.

## III.    CONCLUSION

For the foregoing reasons, the Motions to Dismiss[162] filed by Defendant the City of Baton Rouge/Parish of East Baton Rouge is **DENIED**.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this <u>14th</u> day of _____ March _____, 2025.

*Shelly D. Dick*
_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[160] *Id*. at ¶¶ 140, 143, 146, 160–61, 165, 170–72, 184, 188.
[161] *See also Jordan*, 593 F. Supp. 3d at 370; *Zavala*, 2018 WL 4517461, at *17–18 (concluding same when faced with similar allegations against the City/Parish in the context of EBRPP's conditions of confinement).
[162] Rec. Doc. 19.